## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**             **Hon. Robert H. Cleland**

**v.**

**JAY A. SCHWARTZ,**          **No. 3:19 CR 20451**

        **Defendant.**

_____/

### GOVERNMENT'S OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS (DOCS. 49, 51, AND 52)

## I.    INTRODUCTION

Long on rhetoric but short on substance, Mr. Schwartz's efforts to suppress the Rizzo and Reynolds wiretaps fail.  He has no standing to challenge the wiretaps because he is unable to identify an offending interception involving one of his conversations.  And even if he did have standing, his legal and factual reasons for suppressing the wires are implausible.  Lastly, Mr. Schwartz's request to disclose the Government's trial strategy under the claim that anything not listed in the indictment must be Rule 404(b) "other acts" evidence has no merit.  For these reasons and those detailed below, the Court should deny Mr. Schwartz's motions.

II.   <u>**ARGUMENT**</u>

    A.    **Mr. Schwartz has no standing to contest the wiretaps.**

    Only an "aggrieved person . . . may move to suppress the contents of any wire or oral communication intercepted" under Title III "or evidence derived therefrom," 18 U.S.C. § 2518(a), and contrary to his contentions, Mr. Schwartz is not a Title III "aggrieved person." An "aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." *Id.* at § 2510(11). Mr. Schwartz has identified no interceptions to which he was a party or any other basis to believe he was the victim of an unlawful interception sufficient to confer standing, such as an improper interception occurring at his home or businesses.

    Congress intended to codify in Title III "[then-]existent standing rules" for searches and seizure, *Alderman v. United States*, 394 U.S. 165, 175 n.9 (1969), meaning "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence," *id*. at 171–72. Title III standing is thus limited to situations involving "conversations of a [defendant] himself or conversations occurring on his premises, whether or not he was present or participated in those conversations." *Alderman*, 394 U.S. at 176. As courts have subsequently recognized, a defendant

does not have standing to challenge a wiretap where "neither his phone nor his conversations [are] implicated." *United States v. Cruz*, 594 F.2d 268, 274 (1st Cir. 1979); *see also United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975) ("[U]nder 18 U.S.C. § 2510(11) an 'aggrieved person' is one who participated in the intercepted conversation or on whose premises the conversation occurred."); *United States v. King*, 478 F.2d 494, 506 (9th Cir. 1973) ("[A] defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises."). Mr. Schwartz identifies no improper interceptions in which he was a participant, and thus he has no standing to challenge either the Rizzo or the Reynolds wiretaps, the latter being a wiretap in which he has identified no offending interceptions, much less ones that can confer standing for him.

Mr. Schwartz cannot even rely on the dubious "target" standing theory. The Supreme Court has consistently rejected the claim that a person can have standing to challenge a Fourth Amendment search simply because that search was directed at him as a "target." *See Rakas v. Illinois*, 439 U.S. 128, 138 n.6 (1978) (The suppression argument that the defendant "was the 'target' of the search . . . was advanced by the petitioner in *Jones v. United States* and implicitly rejected by the Court."); *id.* at 134 ("A person who is aggrieved by an illegal search and seizure

only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."); *see also United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) (rejecting argument that being named as a target "somehow confers standing . . . *vis-a-vis* [another person's] home and telephone").  That is true, moreover, even when the defendant was named as a target subject in the wiretap applications. "The defendant only has standing as to conversations in which he participated, or which occurred over a telephone belonging to him: the fact that he was named in orders, but not intercepted does not give rise to standing."  *United States v. Dickerson*, 651 F. Supp. 2d 739, 741 (N.D. Ohio 2009); *United State v. Giacalone*, 455 F. Supp. 26, 41 (E.D. Mich. 1977) ("Congress did not intend to confer standing to object to electronic surveillance to anyone other than those whose conversations were overheard and those whose premises were subjected to electronic surveillance.").  While named as a target subject in the Reynolds wiretap, he was never named as a target in the Rizzo wiretaps, which are the only wiretaps in which he identifies an offending interception (although none that involve him).  Target or not, Mr. Schwartz cannot use the theory to establish standing.

All Mr. Schwartz has left to argue is that as long as he was a party to some conversation somewhere, he has standing "to challenge the interceptions as a

whole, regardless of whether or not he was a participant in the specific

conversation he seeks to suppress," an argument rejected by one Sixth Circuit

panel.  *United States v. Asker*, 676 Fed. App 447, 455 (6th Cir. 2017).  That

argument simply repurposes the rejected "target" standing theory by claiming that

a violation of someone else's rights equals a violation of his own sufficient to

confer standing.  *See United States v. Cooper*, 868 F.2d 1505, 1509 (6th Cir. 1989)

(defendant could only challenge interceptions in which he participated because

suppression is available only to "those whose rights were violated by the search

itself, not by those who are aggrieved solely by the introduction of damaging

evidence") (quoting *Alderman*, 394 U.S. at 171–72).  Holding otherwise would

mean despite having no standing to challenge any alleged improper interceptions,

Mr. Schwartz nonetheless has standing to challenge all of them, improper or not.

That long-rejected idea cannot save Mr. Schwartz's challenges to the Rizzo and

Reynolds wiretaps.

> **B.    Nothing about the Rizzo wiretap suggests it is one of the rare, "truly horrendous" cases of non-compliance requiring suppression of the entire wiretap.**

> **1.    The allegedly improper interceptions Mr. Schwartz highlights do not make this case one appropriate for the rare, drastic remedy of complete suppression.**

Although it is difficult to tell from Mr. Schwartz's discussion of Title III

suppression law, his motion is not about whether a given call should have been

minimized or filtered.  Instead, his motion is about whether the entire wiretap

should be suppressed, a point on which Mr. Schwartz offers no legal analysis and a

dubious factual analysis, despite having access to the tens of thousands of

interceptions made during this case, the electronic notes made by the monitors, and

the orders and applications supporting the wiretaps.[1]

As the Government explained in its memorandum opposing discovery, Title

III's suppression remedies are communication-specific.  (Mot. in Opp., Doc. 23, at

11–15.)  That means defendants identify specific offending interceptions, and then

courts decide whether to suppress those specific offending communications.  *Id.*

Mr. Schwartz makes a much different claim.  He began with the argument that

potentially "hundreds" of interceptions were improper, (Def. Mot. to Compel, Doc.

20, at 20), narrowed it to 56, (Def. Mot. to Suppress, Doc. 49, at 13–14), and then

claimed not that those 56 calls should be suppressed, but that all interceptions from

---

[1] As for establishing a *prima facie* case of objectively reasonable compliance with
wiretap requirements, the Government provided in discovery the wiretap orders
and applications, which provided an extraordinarily detailed description of the
intercept and filter procedures.  Those applications were renewed multiple times,
showing a high level of court supervision in a complex corruption case where the
defendants' aim was to deceive the public about their corrupt relationships.  And
the Government provided Mr. Schwartz with the recordings and electronic notes
by which to measure the Government's compliance with the orders.  The best Mr.
Schwartz can do is identify 56 out of 25,000 interceptions that were allegedly
improper.  That is more than enough to establish a *prima facie* case of compliance.
*See, e.g., United States v. Gray*, 372 F. Supp. 2d 1025, 1042 (N.D. Ohio 2005).

the wiretaps should be suppressed, even though none of the alleged offending calls have anything to do with his case.  In other words, he wants the Court to suppress interceptions for which there is no indication of any impropriety.

Mr. Schwartz makes no effort to analogize his claim to the cases that discuss suppression of an entire wiretap, leaving one to conclude (correctly) that those cases do not help him.  In a "truly horrendous" case of non-compliance, the entire wiretap could be suppressed if a defendant can prove widespread improper interception, *United States v. Hoffman*, 832 F.2d 1299, 1308 (1st Cir. 1987), or that the "protective limitations" of the wiretap order "were completely defeated" by improper conduct, *United States v. George*, 465 F.2d 772, 775 (6th Cir. 1972); *but see United States v. Baranek*, 903 F.2d 1068, 1070 n.4 (6th Cir. 1990) ("We believe that *George* is a decision limited to its facts," and "are not prepared to hold . . . that any departure from the order of authorization will result, *ipso facto*, in suppression.").  But that relief is exceedingly rare and drastic.  *See, e.g., United States v. Baltas*, 236 F.3d 27, 32 (1st Cir. 2001) (Suppression of all communications is inappropriate for "errors in minimizing one particular interception within the context of a lengthy and complex investigation."); *United States v. Dimora*, 836 F.Supp.2d 534, 583 (N.D. Ohio 2011) ("Of course, even if these few calls constituted a pattern . . . it would not warrant the drastic remedy Dimora seeks—suppression of all calls captured by the wiretaps.  At most,

suppression of only the non-pertinent calls that were improperly minimized would be appropriate."); *United States v. Gray*, 372 F.Supp.2d 1025, 1046 (N.D. Ohio 2005) ("Despite Gray's contentions, sporadic failure to minimize does not warrant suppressing all intercepts.").

Even if one assumes Mr. Schwartz is correct that the 56 calls were improperly intercepted, he says nothing about how that amounts to more than a "sporadic failure," *id.*, and that even if it "constituted a pattern," *Dimora*, 836 F. Supp. 2d at 583, why it would require more than suppression of the 56 offending calls. The FBI intercepted over 25,000 calls and Mr. Schwartz identified 56— 0.22%—as problematic. Said differently, Mr. Schwartz is asking the Court to invalidate an entire wiretap based on a 99.78% rate of proper interception. If one halves the number of interceptions and doubles the amount of troubling calls, that rate goes to 99.11% of proper interceptions. That does not compare well to the 1.3% of problematic calls the Sixth Circuit has held were insufficient to establish even a *prima facie* claim of abuse. *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985) (defendant's claim that 117 of 9,000 interceptions were improperly minimized was insufficient to establish a "*prima facie* pattern of abuse").

In this respect, it helps to recall *Scott v. United States*, 436 U.S. 128, 140 (1978), where the agents made no effort to minimize the 348 intercepted calls, Brief for United States in *Scott v. United States*, No. 76-6767, 1978 WL 206669, at

7, resulting in 60% of the interceptions being non-pertinent, *Scott*, 436 U.S. at 133.
But "blind reliance on the percentage of non-pertinent calls intercepted is not a
sure guide" to deciding whether the minimization requirement was met because the
non-minimized calls "may have been very short," "one-time only calls," or
"ambiguous in nature," among other reasons. *Id.* at 140–41. The petitioner was
thus left with seven calls that apparently should have been minimized but were not,
and yet the petitioner still lost because the Supreme Court agreed "that the agents
did not act unreasonably at the time they made the interceptions" despite making
no minimization efforts at all. *Id.* at 143. In *Scott*, then, the Supreme Court
accepted a 2% error rate for which there were no minimization efforts at all, a
factual situation far different than the one here which Mr. Schwartz asserts is a
basis for total suppression.

> **2.    Minimal scrutiny indicates Mr. Schwartz's vague claims
> about the improper interception of 56 calls are highly
> dubious.**

Despite much time and motions practice, the precise factual nature of Mr.
Schwartz's improper interception claims remains elusive. He began with the
assertion that potentially "hundreds" of privileged communications were
improperly intercepted. (Def. Mot. to Compel, Doc. 20, at 20.) That number has
fallen to 56 calls, but the nature of the calls remains unclear. Mr. Schwartz, for
example, claims that one call on November 2, 2015 with Richard Manczak was

9

improperly intercepted.  There were three calls with Mr. Manczak on that day that were made available to investigators.  Call 6158 contains no audio, call 6182 lasted 6 seconds, and call 6203 lasted 9 seconds and contains no conversations.  Mr. Schwartz identifies a December 13, 2015 call with Charles Bullock as problematic but VOIP call 1708 was the only call with Mr. Bullock that day to produce an audio recording for investigators, and it contains nothing but 16 seconds of static.[2]

Mr. Schwartz identifies calls with Dennis Cowan as problematic.  The first call (call 113) occurred on day three of the wiretap.  The monitoring agent's notes identify Mr. Cowan as "Dennis [Last Name Unknown]" and indicate that the call was minimized and later spot-checked.  The date of the call, the inability to identify Mr. Cowan's last name, and its minimization and spot-checking hardly support the conclusion that agents disregarded intercept procedures.  Mr. Cowan's relationship with Rizzo, moreover, is far from clear in his other calls.  The December 3, 2015 call with Mr. Cowan, VOIP call 1099, includes a discussion of

---

[2] It is possible that these discrepancies resulted from production of unfiltered interceptions to Mr. Schwartz in discovery, meaning he has copies of calls that were never provided to the investigating agents.  The Government initially produced to Mr. Schwartz only the filtered interceptions and retained a copy of those interceptions in its file.  Some of the files in that production were faulty, and the FBI produced a new set of recordings, delivering them directly to Mr. Schwartz's counsel. The FBI technician producing that copy may have provided all interceptions to Mr. Schwartz, including those that had been filtered from the investigative team, making it appear to Mr. Schwartz that the investigative team received calls marked privileged.

political fundraising, making the conversation far from a clear-cut case of privilege.

In call number 3631 on September 24, 2015, one of the attorneys identified in Mr. Schwartz's motion who had a significant number of the 56 calls with Rizzo expressly said he did not want to do legal work for Rizzo and instead wanted to be a political consultant.  In call number 4221 on October 1, 2015, the same attorney specifically describes a plan to hold a party for a local official, pay for it, receive reimbursement from Rizzo, and then conceal the reimbursement through billing. One can forgive monitoring agents for believing there was no legitimate attorney-client relationship between Rizzo and this attorney, yet Mr. Schwartz claims calls with this attorney make the Rizzo wiretap so far outside the acceptable practice that the entire wiretap must be suppressed.

This call-by-call analysis, of course, is just the beginning.  Indeed, analysis of all 56 calls is just the beginning because Mr. Schwartz needs to prove such a pervasive pattern of misconduct that the entire Rizzo wiretap deserves suppression. A handful of calls with dubious claims of privilege or improper minimization do not promote that goal but instead undermine it.  The analysis, moreover, will involve far more than 56 calls because the Government will need to put them in context with other calls and other evidence, as the discussion of calls 3631 and 4221 above reveals.

But this fishing expedition is what Mr. Schwartz wants.  In his discovery motion, he sought the "names of all Filter Agents and Filter AUSAs who reviewed, listened to and/or monitored or minimized any communication" between Mr. Schwartz and either Rizzo or Reynolds "and any reports generated by any of these agents or AUSAs," "All acknowledgments signed by any" agents participating in the wiretaps, "All logs identifying the FBI agents (or other law enforcement agency) who monitored or intercepted" calls, and "any communications between Monitors, Agents, Filter Agents, Filter AUSAs and any other third parties regarding the process or procedure for interception, recording or minimization." (Def. Mot. to Compel, Doc. 20, at 24–25.)  The liberal use of "any" and "all" suggests an expansive inquiry not aimed at any set of interceptions, but the conduct of the wiretap as a whole.

So before blasting the Government with superheated misconduct rhetoric, Mr. Schwartz should at least acknowledge what he is asking the Government and the Court to do, namely, the factual re-creation of a 5-month wiretap occurring over 5 years ago, involving over 25,000 interceptions and likely dozens of agents needed to monitor and filter the interceptions.  This is what the Government meant when it said indulging Mr. Schwartz's speculations would engender significantly more litigation.  And to what end?  The possibility of identifying a 57th irrelevant call that should have been minimized or filtered?  Learning of personnel

scheduling problems on a given day in which nothing of substance in Mr.

Schwartz's case occurred? Discovering the bathroom habits of a given FBI agent?

The most likely result will be the waste of significant time and resources

debating whether a small number of calls could have been minimized 10 seconds

earlier, whether a few sentences more should have been withheld from the

investigative team, and whether a vague discussion of various business and

political matters should have been deemed legal advice at the time the Filter Team

released the communications to the investigative team. Mr. Schwartz has given no

reason, moreover, to believe that any debatable calls will impact his trial in any

way and certainly nothing to suggest a total defeat of wiretap procedures. Mr.

Schwartz has thus given no reason to conclude that the wiretaps, before or after the

extensive evidentiary hearing he contemplates, should be suppressed in their

entirety or that an evidentiary hearing is needed to make that conclusion.

### 3. Mr. Schwartz bears the burden of production and persuasion here, but he has failed to carry it.

Now is a good time to remember that it is Mr. Schwartz's burden to prove

his suppression claims and to justify the need for an expansive evidentiary inquiry,

not the Government's. As the analysis in the above paragraphs indicate, Mr.

Schwartz's claims are not what they seem. Mr. Schwartz thus finds himself in

much the same position as the defendants in *United States v. Giacalone*, 853 F.2d

470, 482 (6th Cir. 1988). There, the defendants in the district court "alleged the

government did not property limit the scope of surveillance," *id.*, but "did not give any specific examples of conversations which should not have been monitored," much like Mr. Schwartz's claim in his discovery motion that potentially "hundreds" of calls were improperly intercepted or not filtered.

The district court held that the *Giacalone* defendants "failed to make a 'sufficiently definite, specific, detailed and nonconjectural' showing of a material issue of fact so as to justify an evidentiary hearing on the minimization issue," but nevertheless gave the defendants an opportunity to supplement their claims. *Id.* The defendants did so, and the district court—instead of shifting the burden to the Government—scrutinized the claims and concluded that "most of the examples cited by defendants" involved permissible spot-checking and that the "defendants had been unable to show a *prima facie* pattern of insufficient minimization over the period of the surveillance" to justify an evidentiary hearing and suppression. *Id.*

The Sixth Circuit upheld this reasoning and rejected the defendants' argument that "they were entitled to a hearing as a matter of course because the *government* has the burden of proving that the minimization requirements were met." *Id.* (emphasis in original). And like Mr. Schwartz, the *Giacalone* defendants argued that the district court's process was unfair "because all of the evidence relating to the government's compliance with the minimization requirement remained in the government's possession," and the defendants "apparently claim

14

that they had a right of access to all of the surveillance records and to present evidence gleaned from the records at an evidentiary hearing." *Id*.

The Sixth Circuit rejected this argument because it was "premised on the assumption that the government bears the burden of production and persuasion concerning its compliance with the minimization requirements." *Id.* The presumption was mistaken because the Sixth Circuit has long held that in the Title III context, "it is well established that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *Id.* (quotation marks omitted). Courts have consistently followed this reasoning in the decades since *Giacalone*. *See, e.g., United States v. Juarez*, 2015 WL 3522517, at *5 (E.D. Mich. June 4, 2015) ("A defendant may not rely on generalized complaints that the government failed to fulfill its duty to minimize, but where the government provides the defendant with the tapes made during electronic surveillance, the defendant must identify specific conversations that were not minimized."); *United States v. Gordon*, No. 11-CR-20752, 2013 WL 461780, at *7–8 (E.D. Mich. 2013); *United States v. Allen*, No. 5:09-CR-00015, 2010 WL 1742118, at *3–4 (W.D. Ky. 2010).

Mr. Schwartz's case is already well-along the *Giacalone* path. He initially made vague, speculative claims about potentially "hundreds" of improperly intercepted calls. Those claims were narrowed to 56 calls, and the Government has

15

sufficiently scrutinized some of them above to show they are not "sufficiently definite, specific, detailed and nonconjectural" to require a hearing on suppression. *Giacalone*, 853 F.2d at 482.  And again, like the *Giacalone* defendants, Mr. Schwartz is left to argue that despite specifics, he is entitled to the fishing expedition described in his discovery motion to find factual support for a speculative, flawed suppression theory.  The Court should follow through with the analysis and reach the same conclusion as the *Giacalone* district court and the Sixth Circuit.

> ### C.    The Fourth Circuit's recent case on filter procedures does not affect the validity of the wiretaps.

Mr. Schwartz next claims the Fourth Circuit's recent criticism of filter teams should lead the Court to invalidate both the Rizzo and Reynolds wiretaps, but that case does not support the relief Mr. Schwartz seeks.  *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019), involved the overt search of a criminal defense law firm and the filter procedure identified in the warrant for handling seized material.  The filter procedure permitted the filter team to decide in the first instance which of the seized materials were not privileged (or subject to the crime-fraud exception) and could be disclosed immediately to the investigation team.  *Id.* at 165–66.  The Fourth Circuit held that privilege determinations were a judicial function, and the filter process improperly delegated that function to the filter team.  *Id.* at 176–77.  The solution, though, was not to invalidate the search

warrant.  Instead, the panel enjoined the filter team from reviewing the seized materials and strongly suggested that the appropriate procedure would involve presenting the seized material to the magistrate judge who could then make the appropriate privilege decisions.  *Id.* at 183, 181.

No other circuit has followed *In re Search Warrant*, and nothing in the opinion suggests that its reasoning should apply to wiretaps.  The few district courts to consider the case emphasize the fact that *In re Search Warrant* involved the search of a criminal defense law firm and then doubt that its reasoning would apply to all searches that might uncover privileged information.  *See In re Search Warrants Executed on April 28, 2021*, No. 21-MC-425, 2021 WL 2188150, at *2 n.3 (S.D.N.Y. 2021) (Appointing a special master, but noting that *In re Search Warrant* "did not hold that the Government's use of a filter team is categorically inappropriate."); *In re Sealed Search Warrants*, No. 20-03278-MJ, 2020 WL 6689045, at *2 (S.D. Fla. 2020) (distinguishing *In re Search Warrant* because it dealt with the search of a law firm, and noting that filter teams "are routinely employed to conduct privilege reviews").  Moreover, *In re Search Warrant* emphasized the seizure of 52,000 e-mails, of which only 116 related to one of the individuals under investigation.  That is the opposite of Mr. Schwartz's wiretap case, where 56 of over 25,000 interceptions are allegedly problematic.

Although Mr. Schwartz and the Fourth Circuit rely on *In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006), the Sixth Circuit actually acknowledged that filter teams "seem to be used primarily in limited, exigent circumstances in which government officials have already obtained the physical control of potentially-privileged documents through the exercise of a search warrant," *id.* at 522. "In such cases, the potentially-privileged documents are already in the government's possession, and so the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege." *Id.* at 522–23. This reasoning suggests the Sixth Circuit, at least, would view use of a filter team during a wiretap differently from how the Fourth Circuit viewed the use of a filter team during the search of a criminal defense law firm.

Other considerations support the conclusion that *In re Search Warrant* should not be extended beyond the search of a law firm. The Fourth Circuit's opinion suggests that *all* the material seized from the law firm must be evaluated by a judicial officer for privilege before any of it may be disclosed to the investigative team. It is hard to imagine the Fourth Circuit extending that requirement to materials seized from a location other than a law firm or, relevant here, during a wiretap of an individual who happens to have retained a lawyer. Doing so would require an enormous expenditure of judicial resources to protect

18

against the risk that a small portion of the seized materials may be privileged and improperly disclosed to investigators.[3]  Those resources arguably may be justified in the physical search of an entire law firm, but they seem misplaced in other contexts.

And unlike the overt search of an entire law firm, wiretaps are covert and often uncover information agents can use to continue their investigation in a timely, covert manner.  The investigative team is in the best position to make timely use of wiretap information, including preventing the delivery of dangerous narcotics like heroin or fentanyl, and protecting individuals against threats.  If judicial officers were required to evaluate wiretap interceptions for privilege before disclosure to the investigative team, those proactive law enforcement efforts would be hindered greatly.

In any event, applying *In re Search Warrant* here would not mean suppressing the wiretaps.  It would mean delivering all interceptions that were reviewed by the filter tram to the Court so it could review them for privilege. Nothing in the Fourth Circuit's reasoning leads to the conclusion that the seizure of privileged materials should result in suppression of the entire search.  The

---

[3] Wiretaps involve other methods unavailable in the search warrant context to reduce infringing on the attorney-client privilege.  Those methods include minimization, spot-checking, and updating lists of lawyers known to have attorney-client relationships with the user of the target telephone.

Government does not intend to use any of the calls Mr. Schwartz identified as

problematic, so whether those calls are privileged is irrelevant.

The attorney-client privilege, moreover, is not a constitutional one, meaning

the full taint protections of *Kastigar v. United States*, 406 U.S. 441, 461–62 (1972),

do not apply, and the Court need do no more than suppress the privileged

communications, *United States v. Warshak*, 631 F.3d 266, 294 (6th Cir. 2010); *see*

*also United States v. Coffman*, 574 Fed. Appx. 541, 565 (6th Cir. 2014).  And even

if *Kastigar* applied, the privileged communications Mr. Schwartz identifies have

nothing to do with his case, and thus there is little risk that the investigation of him

is tainted by exposure to privileged materials.  *In re Search Warrant*, while

promising for Mr. Schwartz on its surface, ultimately offers nothing to help his

effort to suppress the wiretaps.

### D.    The Government will provide notice of "other acts" evidence in accord with Rule 404(b) and applicable law.

The Government will comply with Rule 404(b)'s actual disclosure

requirement, not the one Mr. Schwartz has devised.  Rule 404 prohibits evidence

of "any other crime, wrong, or act" to prove conformity to character.  Rule 404(b)

provides an exception when the evidence is used for "another purpose, such as

proving motive, opportunity, intent, preparation, plan, knowledge, identity,

absence of mistake, or lack of accident."  Prosecutors seeking to admit Rule 404(b)

evidence must "provide reasonable notice," generally before trial, "so that the

defendant has a fair opportunity to meet it."  Fed. R. Evid. 404(b)(3).  Notice one

week before trial is sufficient, *United States v. French*, 974 F.2d 687, 694–95 (6th

Cir. 1992), unless the Court orders otherwise.

Mr. Schwartz believes that overt acts done furtherance of the charged

conspiracy but not listed in the indictment are somehow "other acts" under Rule

404(b), but that is mistaken.  The Government need not list an overt act in the

indictment before it can present evidence of the act at trial.  *See United States v.*

*Anderson*, 353 F.3d 490, 502 n.9 (6th Cir. 2003).  And an overt act, nearly by

definition, is not an "other act" governed by Rule 404(b).  "Overt acts" are ones

taken "for the purpose of advancing or helping the conspiracy," Sixth Circuit

Pattern Criminal Jury Instruction 3.04(1), and are thus "inextricably intertwined"

with the charged offense, meaning they are outside the scope of Rule 404, *e.g.,*

*United States v. Sumlin*, 956 F.3d 879, 889–90 (6th Cir. 2020); *United States v.*

*Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993) (claimed "other act" evidence was

actually "evidence of overt acts in furtherance of the heroin conspiracy").  The

Government does not intend, therefore, to give notice that it may offer proof of

unalleged overt acts at trial.

## III.    <u>CONCLUSION</u>

For these reasons, the Court should deny Mr. Schwartz's pretrial motions

(Docs. 49, 51, and 52).

MERRICK B. GARLAND
Attorney General of the United States

BRIDGET M. BRENNAN
Acting United States Attorney for the
Northern District of Ohio

s/ Gene Crawford
Gene Crawford (OH: 0076280)
Michael J. Freeman (OH: 0086797)
Special Assistant Attorneys to the
Attorney General in the Eastern
District of Michigan

Four Seagate, Suite 308
Toledo, Ohio 43604
(419) 259-6376
gene.crawford@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of June, 2021 a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

/s/ Gene Crawford
Gene Crawford
Special Assistant Attorney to the
   Attorney General in the Eastern
   District of Michigan